HATHORN v. STATE.*

(Division B. Feb. 9, 1925.)

[102 So. 771.   No. 24647.]

1. HOMICIDE. *When dying declaration is admissible stated.*

> To make a dying declaration admissible in evidence, it must appear that the declarant was under a sense of impending death and had abandoned all hope of recovery. If there is a reasonable doubt that the declarations were so made, they should be excluded.

2. CRIMINAL LAW. *Confession must be shown to have been free and voluntary; upon objection proof of free and voluntary character should precede admission of confession.*

> Before a confession is received in evidence, where it is objected to, it must be shown that it was free and voluntary, and, where objection is made, the proof that it was free and voluntary should precede the admission of the confession.

3. CRIMINAL LAW. *Confession should be introduced in proof in chief.*

> A confession should be offered in the proof in chief of the case and not reserved to be used in rebuttal of the testimony of the defense.

4. CRIMINAL LAW. *Accused entitled to acquittal, when evidence raises reasonable doubt as to whether killing was in self-defense.*

> It is improper to give an instruction for the state in a criminal

prosecution to the effect that before a killing can be justified on the ground of self-defense it must appear to the reasonable satisfaction of the jury, from the whole evidence, that the defendant at the time he cut and stabbed the deceased had reasonable ground to believe and did believe the deceased was about to kill him. All that is required in such case is that the evidence raise a reasonable doubt in the minds of the jury as to whether the killing was in self-defense or not.

---

*Headnotes 1. Homicide, 30 C. J., Sections 498, 503; 2. Criminal Law, 16 C. J., Sections 1468, 1509; 3. Criminal Law, 16 C. J., Section 2186; 4. Criminal Law, 16 C. J., Section 1585.

APPEAL from circuit court of Perry county.
HON. R. S. HALL, Judge.

Jim Hathorn was convicted of murder, and he appeals. Reversed and remanded.

*A. T. L. Watkins,* for appellant.

It is remotely possible that a jury might have convicted the defendant, if the incompetent testimony had been excluded, but this must, of course, be a matter of conjecture. But looking at it now, no one can tell what the verdict was based on, the jury could not, and I seriously doubt if this court can tell whether the dying declaration is in or not in, as a matter of evidence.

Beginning with *Bell* v. *State,* 72 Miss. 507, and as reannounced in the recent case of *Sparks* v. *State,* 74 So. 123, we say it is uniform law that a dying declaration is a question solely for the court in the absence of the jury, that is before the jury should be permitted to hear it. If damaging statements are heard by the jury, it might be impossible to disabuse their minds of it, even if they were directed to do so and if they tried. Some deadly vengence may have seized their minds, by certain cruel acts set forth and they could not rid their minds of it. I have examined authorities from the Bell case above and the *Owen case,* 59 Miss. 547, and all the way down to date and I have yet to find a case where that issue is or should

be left to a jury. It is stated in 89 So. 835, that a predicate must be laid. It must be *in extremis* and with full knowledge of his danger. The declaration must be limited to acts which caused death (not conclusions). It must be made under a fixed belief that death is impending, 98 So. 693. And the testimony must be such that would be competent if the witness were present. I take it that the statement, "struck me for nothing" would not be accepted by any court as competent evidence, it would require the facts and circumstances and not conclusions, 96 So. 459; 89 So. 835. It is hearsay unless made under a belief of impending death, 93 So. 57.

No one can say how long before death, the deceased made the statements, nor what his condition was at the time of making the statement. Dr. Green made his voluntary statements and showed conclusively that it did not come up to the requirements of law. Of course, the jury had heard them and no one could, nor can they now say, that it had no effect on the jury. I am unable to ascertain what portions of the declaration are excluded or what portions, if any, the court intended to exclude. But, I do say without hesitation, that none was competent as such, by any rule laid down by the courts. The court will observe that deceased was not trying to impress that appellant had injured him, but that "he did it for nothing," just a conclusion of a drunk negro.

We fail to understand why the court would attempt to exclude the dying declarations, as shown by Dr. Green and afterward let him return to the witness stand and contradict his former statements. His second statement is no nearer a dying declaration than the first.

A confession is not admissible in evidence, unless it is shown to be free and voluntary, beyond a reasonable doubt. 79 Miss. 517. A man in custody of an officer and being accused is not making a free and voluntary confession. The question whether or not the alleged confession is admissible, is a question of law to be decided by the court. The so-called confession was offered in

rebuttal and no predicate had been laid to make it competent and nothing had been done to make it rebuttal testimony. It was an attempt to establish the *corpus delicti* by confession.

It was certainly error to hold back the witness Walley until after the state had made its case in chief and the defendants had rested and introduced it under the guise of rebuttal. Leading witnesses is a sin pardoned in advance. See record from beginning to end.

It was manifest error to try to impeach defendant on immaterial and irrelevant issues.

*E. C. Sharp,* Assistant Attorney-General, for the state.

The conditions which must exist to make a dying declaration competent are stated by this court in the case of *Bell* v. *State,* 72 Miss. 508. The first dying declaration when attempted to be introduced was excluded by the court for the reason that at the time of the making, as shown by the evidence, deceased had a slight hope of recovery. But several days later he made a similar statement when all hope had fled. Conditions and circumstances under which this last declaration was made were fully investigated by the court and by it determined that at the time of the making Watson had no hope of recovery.

If the jury had accepted the appellant's testimony as to how the cutting occurred, a verdict of not guilty would necessarily have been returned. The testimony was conflicting as to what really happened. The testimony of the state being ample to sustain a verdict of guilty, while on the other hand the testimony of appellant, if believed, warranted a verdict of not guilty.

The confession of appellant was free from any legal objection, so far as shown by the record. In fact, no effort was made to show that it was not voluntary and without fear of punishment or hope of reward. The jury was fully instructed as to the law.

We respectfully submit that the judgment of the lower court should be affirmed.

Argued orally by *A. T. L. Watkins,* for appellant, and by *E. C. Sharp* Assistant Attorney-General, for the state.

ETHRIDGE, J., delivered the opinion of the court.

The appellant was indicted and tried and convicted for the murder of one Judge Watson, a human being. The state proved part of its case by the dying declaration of the deceased which is assigned for error. The first witness offered by the state was the county prosecuting attorney, who testified that the deceased sent for him and made a statement, viz:

"I sent for you, you are attorney of this county, and I want to tell you before I die that this negro, Jim Hathorn, stabbed me for no cause in the world, and I don't feel like I will ever live—in fact, I know I will not live. I am bleeding inside now. If I die, I want you to know before I die the facts in this case, that you may know why it was done."

This statement was objected to and excluded on motion by the court. Thereupon the state offered Dr. J. E. Greene, a physician, who testified that he attended the deceased after he was cut; that it took two hours to control the flow of blood; that he kept him under his treatment for four or five days and then sent him to a hospital. The physician stated that the deceased made several statements with reference to his dying; that the deceased stated he did not think he would get well. "He told me several times, 'Doctor, I am going to die, I am filling up in here; I am a sick negro; I can't live.' I told him I thought probably I could pull him through, and he answered, 'I hope so, but I am filling up, and I am going to die; this is killing me—this filling up in here.'" Dr. Greene further stated that he saw the deceased twice a day, and that he said on one occasion: "If I get well,

what about getting Mr. Fishel?'' This evidence was excluded. Later on during the trial the Doctor was again called to the stand by the state, and was asked the following:

''Q. State when was the last time you saw and administered to him? A. I can't say the exact date.

''Q. What circumstances or occasion? A. I went to his home, and carried him from his home to the train, and sent him to the hospital at Laurel.

''Q. State whether or not Watson made a dying declaration to you on that occasion as to the fact of this stabbing. (Objected to; sustained.)

''Q. Did he make a statement to you that morning as to the circumstances of the stabbing? A. He did.

''Q. What did he say to you about his condition, if anything? A. He said he was coming back a dead negro.

''Q. Was that the last conversation he had with you? A. Yes.

''Q. State what the negro said to you about the circumstances of the stabbing, if anything, after he told you he was coming back a dead negro. A. He said, 'I am coming back a dead negro, and all for no cause—he had no cause for stabbing me.' ''

This testimony was objected to. Thereupon the district attorney asked the following:

''Q. State if at that time, the time prior to this date you have just testified about, if Watson said living or dying. A. At this specific time?

''Q. Yes. A. He said the second morning I talked to him alone.

''By Attorney for the Defendant: This is going back of the time he made this statement, and that is objected to.

''By the Court: Will have to wait and see what he says.

''By the Witness: A. He said he was filling up and was going to die, and that this negro had no cause for it, except as they went down in the car this negro woman

was sitting between them, and that he was fooling with her, and that he kinder had the best of the other negro with the woman.

"Q. Who? A. The dead negro, and he asked Hathorn if this woman was anything to him, and Hathorn said she was not, and he went ahead, and that was the only thing he had against him. (Moved to exclude this. Overruled. Exception.)

"By the Court: You say the dead negro made that statement to you after he told you he was going to die? A. Yes, sir."

On cross-examination the doctor stated that he made one of his statements the next morning after he was stabbed, and that about five days after he was stabbed his condition seemed better, and he had the conversation with reference to employing Mr. Fishel.

"Q. The statement he made on the day he was leaving that you first testified to was after he said he was going to die? A. Yes.

"Q. These other statements you have testified to were made before he said he was coming back a dead negro? A. Yes, the first statement the second morning, about four or five days when he was getting some better, and then it was he made the statement about going into the bottom of it and getting Mr. Fishel to help. (Moved to exclude. Overruled. Exception.)

"By the Court: You brought out what was said later —if you want that excluded I will exclude the second statement.

"By the Attorney: We want it excluded.

"By the Court: All that part of the statement made on the second day I am letting go to the jury; the statement in which he said he was going to die, the jury will consider that.

"By the Attorney: I want all before he expressed a hope of recovery out.

"By the Court: All right—the second statement brought out by the cross-examination of Dr. Greene.

"Q. From the time you commenced to visit the deceased he began to try to fix the blame of this difficulty? A. Yes, every time.

"Q. He was continually trying to fix the blame, trying to get you to help him employ counsel? A. He only did that one time.

"Q. He was trying that at the time he thought he was going to die and another time he was not? · A. What?

"Q. Trying to fix the blame? A. It seemed to be fixed in his mind as to this negro, and he wanted to bring another in."

We do not think the dying declarations come up to the legal standard. We think the evidence does not show satisfactorily that the deceased thought his death was immediate or impending, or that he had abandoned all hope or considered his condition *in extremis.* The testimony of the county attorney and that of the physician when he was first called show clearly that the deceased entertained some hope of living at the time he made those first statements. The statement made by the deceased the morning he was sent to the hospital that he would come back a dead negro is wholly insufficient to show that he thought death was then immediate and impending. At most, it was an expectation that he would ultimately die from the wound and not the expression of a belief that death was then impending.

In *Bell* v. *State,* 72 Miss. 507, 17 So. 232, the court held as follows: "It is essential to the admissibility of these declarations, and is a preliminary fact, to be proved by the party offering them in evidence, that they were made under a sense of impending death; but it is not necessary that they should be stated at the time to be so made. It is enough, if it satisfactorily appears in any mode, that they were made under that sanction, whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinions of his medical or other attendants stated to him, or from his conduct or other circumstances of the case, all of

which are to be resorted to in order to ascertain the state of the declarant's mind. . . . It is the impression of almost immediate dissolution, and not the rapid succession of death in point of fact, that renders the testimony admissible. Therefore, when it appears that the deceased, at the time of the declaration, had any expectation or hope of recovery, however slight it may have been, and though death actually ensued in an hour afterwards, the declaration is inadmissible.''

It was further held in the Bell case, *supra,* that in passing on the competency of the dying declarations the court was to make full inquiry as to the circumstances, and, if necessary, require all witnesses capable of throwing light on the subject to be produced, and it should be excluded if there be a reasonable doubt of its competency. It is therefore error to admit the dying declaration.

The defendant testified in his own behalf, and was asked the following question:

''Q. Didn't you tell Laurence Walley when he arrested you that you stabbed Judge Watson and that he was not doing anything at all; that he did not have a pistol and did not have a knife, and that you didn't give him any chance; that you all had just been joreeing each other?''

To which the defendant replied:

''A. No, I did not tell him that.''

After the defendant rested his case Laurence Walley was introduced and asked the following question:

''Q. State whether or not Jim Hathorn made any statement to you about the facts of this cutting. (Objected to. Overruled. Exception.) A. He did.

''Q. What was the statement? A. When I arrested him he asked 'what I was going to do with him.' I told him put him in jail; he asked was Judge Watson dead, and I told him—he was not then—and I asked him what he did it for, and he said, 'For nothing.' I asked what it started about. He said, 'they went down about Beaumont and got some whisky and come back, and they stopped coming back, and Burl Long was with them and another

negro boy and a negro woman. (Objected to. Overruled. Exception.) He said that Burl Long went up the road some feet, the negro woman went off a few yards in the woods, and this other boy was there about the car, and he said he and Watson was joreeing, and Watson put him in the dozen, and he cut him, and said he would cut his mother if she put him in the dozen.''

It will be seen from the question asked the defendant on cross-examination that the testimony brought out by this witness was not testimony for which a predicate was laid and it could not be offered for the purpose of contradiction. If it was offered as a confession, which it seems it was, the state could have first proved that it was free and voluntary. The objection of the defendant made this demand upon the state, but it was overruled by the court. The statement by this witness was highly prejudicial. If this evidence was intended to be offered as a confession, it should have been produced when the state was making its case in chief.

For these errors the judgment of conviction must be reversed.

Inasmuch as the case is to be retried, we think it proper to say that the third instruction given for the state to the effect that before a killing can be justified on the ground of self-defense it must appear to the reasonable satisfaction of the jury from the whole evidence that the defendant at the time he cut and stabbed the deceased had reasonable ground to believe and did believe that the deceased was about to kill him or do him great bodily harm, and that the defendant had reasonable cause to believe and did believe that there was immediate danger of such design on the part of the defendant being accomplished, should not have been given, as it does not devolve upon the defendant to prove it is necessary, nor is it necessary that it should appear to the reasonable satisfaction of the jury, but all that is necessary is that the proof in the case raises a reasonable doubt in the mind of the jury. It devolves upon the state to prove all

issues, and does not devolve upon the defendant to prove to the satisfaction of the jury his defense. If, after hearing all of the evidence the jury has reasonable doubt as to whether the defendant acted in self-defense, the defendant is entitled to have a verdict at their hands.

*Reversed and remanded.*